UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                            :
RALPH LOUIS CONETTA,
                                                            :
                    Plaintiff,                                  OPINION & ORDER
                                                            :
            -against-                                           17 Civ. 8524 (GWG)
                                                            :
NANCY A. BERRYHILL, Acting Commissioner
of Social Security,                                         :
                                                            :
                    Defendant.                              :
------------------------------------------------------------x

**GABRIEL W. GORENSTEIN, United States Magistrate Judge**

        Plaintiff Ralph Louis Conetta brings this action pursuant to 42 U.S.C. § 405(g) for

judicial review of the final decision of the Acting Commissioner of Social Security (the

"Commissioner") denying his claim for disability benefits under the Social Security Act (the

"Act").  Both Conetta and the Commissioner have moved for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure 12(c).[1]  For the reasons stated below, the

Commissioner's motion is granted and Conetta's motion is denied.

I. BACKGROUND

        A. Procedural History

        Conetta filed an application for a period of disability and disability insurance benefits

---

        [1] See Plaintiff's Notice of Motion for Judgment on the Pleadings, filed June 18, 2018
(Docket # 14); Memorandum of Law in Support of Plaintiff's Motion for Judgment on the
Pleadings, filed June 18, 2018 (Docket # 15) ("Pl. Mem."); Commissioner's Notice of Motion,
filed Sept. 19, 2018 (Docket # 21); Memorandum of Law in Support of the Commissioner's
Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for
Judgment on the Pleadings, filed Sept. 19, 2018 (Docket # 22) ("Def. Mem."); Reply
Memorandum of Law in Further Support of Plaintiff's Motion for Judgment on the Pleadings
and in Opposition to Defendant's Cross-Motion for Judgment on the Pleadings, filed Nov. 19,
2018 (Docket # 25) ("Pl. Reply"); Reply Memorandum of Law in Further Support of the
Commissioner's Motion for Judgment on the Pleadings and in Further Opposition to Plaintiff's
Motion for Judgment on the Pleadings, filed Dec. 27, 2018 (Docket # 28) ("Def. Reply").

("DIB") on June 3, 2011, alleging a disability onset date of September 20, 2010. See R. 81, 138.[2] The Social Security Administration ("SSA") denied Conetta's application on August 26, 2011. R. 84. Conetta then requested a hearing before an administrative law judge ("ALJ") to review the denial. R. 96-97. Conetta was represented by his attorney at a hearing before an ALJ, which occurred on June 28, 2012, in Jericho, New York. R. 39-77, 78-79. In a written decision dated September 10, 2012, the ALJ found that Conetta was not disabled within the meaning of the Act. R. 26-32. Conetta requested that the Appeals Council review the ALJ's decision, R. 17-20, and on October 22, 2013, the Appeals Council denied Conetta's request for review of the ALJ's decision, R. 1-3.

Conetta filed an action in federal district court appealing the Appeals Council's denial. See Complaint, filed Dec. 4, 2013 (Docket # 1), Conetta v. Comm'r of Soc. Sec., 13 Civ. 8629 (WHP) (GWG) (S.D.N.Y.). In November 2014, the court ordered — as stipulated to by the parties — that the action be remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings. R. 457-59. In an April 27, 2015, order, the Appeals Council remanded the case to an ALJ for further consideration of Conetta's application. R. 460-65. On March 7, 2016, and April 5, 2016, a different ALJ held additional hearings, at which Conetta and his counsel appeared. R. 427-37, 398-426. In a written decision dated May 16, 2016, the ALJ found that Conetta was not disabled within the meaning of the Act. R. 366-90. Conetta requested that the Appeals Council review the ALJ's decision, R. 541, 543-51, and on April 17, 2017, the Appeals Council denied Conetta's request for review, R. 1109-12. This action followed.

_____

[2] "R. __" refers to pages of the Certified Administrative Record, filed Apr. 18, 2018 (Docket # 11), and the Supplemental Certified Administrative Record, filed May 4, 2018 (Docket # 13).

B. <u>Testimony at the 2012 and 2016 Hearings</u>

1. <u>The June 2012 Hearing</u>

At the June 2012 hearing, Conetta testified and was represented by his attorney, James King. R. 41. Conetta testified that he was 47 years old and had a high school diploma and an associate's degree. R. 42. Conetta lives in a private home with his wife, children, and stepmother, R. 43, and his source of income at the time consisted of a workers compensation lump sum award, R. 44. Conetta had been volunteering for the United States Coast Guard Auxiliary since at least 2006. R. 45. After a September 2010 workplace accident that caused Conetta to stop working, his volunteer work consisted of attending business meetings, which totaled around 30 hours a year. R. 45-47. Conetta also volunteered by teaching boating courses. R. 50-51. Conetta had previously would assisted in nautical patrols for the Coast Guard, but he had not done so in around a year and a half due to pain in his back, knees, and shoulder. R. 47-50.

Conetta testified regarding his employment as a licenced electrician and union sub-foreman. R. 43-44, 52-53. Conetta hurt his left shoulder at work in March 2010 but returned to work on "light duty." R. 53. While on "light duty," Conetta worked as a sub-foreman tasked with managing up to 10 employees. R. 54-55. He stopped working entirely in September 2010 due to a back injury sustained at work. R. 52-54. If it were not for his September 2010 back injury, he could still be doing his "light-duty" job as sub-foreman. R. 56. This was true even though he has shoulder and knee pain. R. 58.

As to his injuries and pain, Conetta testified that he had a herniated disk, low back pain, and sciatica, which alternates between both of his legs and affects his knees. R. 57-58. He has difficulty bending at the waist, and tries to do exercises to stretch his back out. R. 58. He does

3

not use a cane.  See R. 59-60.  He uses a "TENS unit" every night before bed.  R. 59-60.

Walking up stairs exacerbates his back pain, as does the weather at times.  R. 60-61.  At the time

of the hearing, Conetta could not "really reach over [his] head too good with [his] left hand,"

R. 61, or push open a swinging door, R. 62.  However, he could do these things with his right

hand.  R. 62.  As to lifting, Conetta could manage to lift up to 10 pounds with his right hand, and

up to five pounds with his left.  R. 63.  The pain forces Conetta to alternate every 15 to 20

minutes between sitting, standing, and walking.  R. 64.

The ALJ posed a series of hypotheticals in order to further pinpoint Conetta's pain in

relation to performing everyday activities, including work activities.  The ALJ asked whether

Conetta, given his impairments, could perform work at public library checking out books behind

a counter.  R. 64-65.  Conetta could not answer, because it would depend on whether he woke up

on any given morning "in agony pain."  R. 65.  Thus, although there would be days when

Conetta could do the work as described by the ALJ, there would also be times when he could

not.  See R. 65-66.  And while Conetta had difficulty assigning a percentage figure to the number

of hours in a week that he could perform the job described by the ALJ, R. 66-67, a figure of 30

to 40 percent was eventually agreed upon, with the statement that even the 30 percent figure was

"unpredictable."  R. 68.  Conetta said that the pain in his back would affect his ability to

concentrate, and that this happened "maybe" "once a day."  R. 62.  Overall, on a scale of zero to

10, "where zero is no pain and 10 is excruciating pain," Conetta stated that he is generally

between a five and seven when taking over-the-counter pain medication.  R. 59.

As to daily activities, Conetta has a "hard time tying [his] shoes" and putting his socks

on, though he attempts to do these things on his own.  R. 69.  He bathes himself, does "some

cooking," and drives to go food shopping and do other errands.  R. 69-70.  He also "tr[ies]" to do

housework including dusting, mopping, vacuuming, doing laundry, and doing the dishes. R. 70. One hobby Conetta engages in is going to a shooting range, where he shoots for about 15 minutes at time using a .22 caliber handgun. R. 70-71. He shoots the gun, which weighs three pounds, exclusively with his right hand. R. 71. Conetta also tries to attend all of his children's baseball and softball games, and either stands to watch the games, or sits in a folding chair. R. 74-75.

## 2. The March and April 2016 Post-Remand Hearings

A different ALJ presided over hearings in March and April 2016, at which Conetta was represented by his attorney. The March 2016 hearing was brief and consisted solely of the ALJ informing Conetta of the hearing process, R. 429-32, questioning him briefly about his volunteer work for the Coast Guard, R. 432-34, obtaining new records, and setting a new date for a supplemental hearing, R. 435-37.

The supplemental hearing took place on April 5, 2016, in White Plains, New York. Testimony was given by Conetta and Robert Baker, a vocational expert, R. 765, who appeared by telephone, R. 400.

The ALJ asked Conetta about his daily activities and hobbies. Conetta testified that he does some housework consisting of vacuuming, making the bed in the morning, and doing laundry. R. 404. He also attends the athletic events of his children. R. 404. Although he drives short distances (for example, to doctors' appointments and to his children's games), he does not engage in any extended travel, R. 405, and sometimes has to stop driving and "walk around the car to try to get the muscles moving to stretch out because [his] sciatic goes right down to [his] feet and crunches [his] toes." R. 418. He does do some yard-work in the form of raking leaves for 15 minutes before he goes back inside to "relax" and ice his back. R. 405. Conetta exercises

by doing leg raises, leg extensions, stretching his arms, and using a one-pound dumbbell to do lateral raises. R. 409-10. He can only sit for 15 to 30 minutes at a time before needing to stand up again. R. 418. He also goes for walks every other day around his block at home, which he estimated to be about a half a mile. R. 410. Conetta goes grocery shopping, and sometimes clothes shopping. R. 406; see R. 419. As to his hobbies, Conetta goes to a shooting range, where he will "shoot 15 rounds" about "once a month." R. 406. Although he used to hunt, he has not done so since 2011. R. 406-07. Conetta stated that since September 2010 (when he injured his back), he had gone hunting "maybe twice." R. 407.

The ALJ questioned Conetta about his volunteer work with the Coast Guard. Conetta explained that he still attends meetings — which last around a half an hour — "once or twice a year." R. 407. Although he has not gone on patrol for the Coast Guard since 2010, Conetta testified that he thinks he went out on a boat with the Coast Guard "once in 2011," although it was not an official patrol. R. 407-08.

Conetta testified to his physical impairments involving his shoulder, back, and knees. His previous shoulder surgery helped "a little bit," but he still experiences pain in the shoulder, and cannot, for instance, do any home repairs on his own. R. 411. Any "[o]verhead activity" — where Conetta needs to reach his hands out in front of him — results in pain: for instance, when he folds laundry. R. 411. As to his back, Conetta ices his lower back and also puts heat on it, either by using his friend's hot-tub, or by taking "hour showers." R. 412. He also tries to do "certain exercises." R. 412.

Conetta received an injection for the back pain, which he says helped, but otherwise takes over-the-counter pain medications because he wants to "stay away from the high drugs" for fear of addiction. R. 412. He does take Ultram and Aleve, which help with the pain. R. 412. He

6

also explained that while some days are "good" (he can take Advil and "the rest of the day could be good"), some days, the pain is so intense that "I've stayed in bed and my wife came home from work and she's like, you didn't get up, and I said, no. And, I'm starving." R. 413, see R. 417. In order to manage the pain he experienced from driving 30 minutes in the car to his hearing that day, he took "four Motrin" before he left home, and "just took two Advil when [he] got out of the car." R. 413.

Regarding his knees, Conetta testified that he has had three surgeries on his right ACL, but that the orthopedist has not looked at the knee since 2010. R. 414-15. Conetta's attorney interjected at that point by explaining to the ALJ that at least one doctor in the record noted that the knee pain might be due to the L4 nerve root impingement in Conetta's back. R. 415. Conetta continued by explaining the sciatic that shoots "down [the] right knee," and sometimes to the left foot as well. R. 415. Also regarding the knee impairment, the ALJ questioned Conetta about his weight. At 5 feet, 7 inches tall and 230 pounds, Conetta stated that he thinks his "weight does have to reflect" on his knee "symptoms" "a little bit." R. 413-14. Indeed, he has "tried to lose some weight . . . by eating right," but since he does not do "much activity," he puts the weight back on. R. 414. Conetta testified that he had no side-effects from his medications. R. 420.

The vocational expert ("VE") testified next, answering multiple questions from the ALJ regarding what work certain hypothetical individuals could perform in the national economy. First, the ALJ asked the VE

> to assume a person of the claimant's age, education and work experience able to do the full range of light work as defined by the Rules and Regulations. His lift, carry limitations will be the same as his push, pull limitations. He would be limited up to occasional climbing ramps and stairs, but without climbing ladders, ropes or scaffolds and occasional balancing, stooping, kneeling, crouching and crawling. He would be limited up to frequent reaching, but with occasional

overhead reaching.

He added that the individual should avoid extreme cold, extreme heat, humidity and vibration. R. 421-22 ("Hypothetical One"). As to whether there was work that such a person could perform in the national economy, the VE responded with three examples of jobs that could be performed: "photocopy machine operator," "router," and "marker." R. 422. The VE noted that these jobs provide for "regularly scheduled breaks" of "15 minutes in the morning, 15 minutes in the afternoon and a half hour to an hour midday." R. 422. As to the next hypothetical, the ALJ asked the VE to assume the same as Hypothetical One, except that the claimant is

> further limited in that he's going to be able to still lift, carry, push and pull 20 pounds occasionally and ten pounds frequently. And, he could still sit for up to six hours. He can stand for four hours and he can walk for four hours. In addition, after -- at one-hour intervals, if he's in a standing position, he should be [able] to shift position permitting him to be off task for five percent of the work period in addition to those regularly scheduled breaks.

R. 422-23. Additionally, the individual, "[a]fter sitting for two hours, [should] also be able to shift position," which is a requirement that "can be accommodated for by the regularly scheduled breaks." R. 423 ("Hypothetical Two"). With these limitations, the VE stated that such an individual could still perform the jobs of "photocopy machine operator" and "router," but that the "marker" job "would be more questionable." R. 423. The VE also added that the individual in Hypothetical Two could also perform the job of "ticket taker." R. 423. The ALJ then asked the VE to assume a new hypothetical individual who has the same limitations as in Hypothetical Two, except that now the individual "would be limited to the exertional limitations for sedentary work and lift and carrying up to ten pounds occasionally and five pounds frequently, same with push, pull." R. 424. In other words: Hypothetical Two, "but now for sedentary work." R. 424

("Hypothetical Three"). As to the individual in Hypothetical Three, the VE stated that work could be performed as an "account clerk," an "addresser," and a "document prepare[r,] microfilming." R. 424.

The VE testified that if the individuals posed in the hypotheticals were to "be off task for 20 percent of the work period," or if they were "limited to only four hours of sitting and one hour of standing in an eight-hour day," then "that would preclude all work." R. 424. The VE acknowledged that although his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), the DOT "is silent" — but "not necessarily inconsistent" — on the issues of "shifting positions, [and] overhead reaching." R. 424-25. Finally, the VE confirmed that if Conetta would "need to be absent more than three times per month, . . . that [would] affect his ability to work in any of [the] hypotheticals." R. 425.

C. The Medical Evidence

The Commissioner and Conetta have both provided summaries of the medical evidence in the record. See Pl. Mem. at 5-17; Def. Mem. at 5-19. The summaries are substantially consistent with each other. The Court had directed the parties to specify any objections they had to the opposing party's summary of the record, see Scheduling Order, filed Apr. 20, 2018 (Docket # 12), ¶ 5, and neither party has done so. Accordingly, the Court adopts both parties' summaries of the medical evidence as accurate and complete for purposes of the issues raised in this suit. We discuss the medical evidence pertinent to the adjudication of this case in Section III below.

D. The ALJ's 2016 Decision

The ALJ denied Conetta's DIB application on May 16, 2016. R. 390. First, the ALJ found that Conetta met the insured status requirements of the SSA on December 31, 2015.

9

R. 369.  Then, following the five-step test set forth in the SSA regulations, the ALJ found at step

one that Conetta had not engaged in "substantial gainful activity" during the time between his

alleged disability onset date — September 20, 2010 — and his date last insured of December 31,

2015 (the "relevant period").  R. 369.  At step two, the ALJ found that during the relevant

period, Conetta suffered from "severe impairments" of "Degenerative Disc Disease of the

Lumbar Spine; Left Shoulder Labral Tear/Tendinitis; Impingement of Right Shoulder; Right

Knee Meniscus and Cruciate Ligament Tear, Status-Post Arthroscopic Repair; [and] Obesity."

R. 369.  At step three, the ALJ found that none of Conetta's severe impairments singly or in

combination met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (the "Listings").  R. 369.  In reaching this conclusion, the ALJ gave particular

attention to listings 1.02 (Major dysfunction of a joint) and 1.04 (Disorders of the spine), and to

Social Security Ruling ("SSR") 02-1p (Policy Interpretation Ruling Titles II and XVI:

Evaluation of Obesity).  R. 369.

Before moving to step four, the ALJ addressed Conetta's residual functional capacity

("RFC").  R. 370-88.  The ALJ found that Conetta had the RFC to perform "light work,"[3] except

that Conetta

> can sit for up to 6 hours in an 8 hour workday, stand or walk for up to 4 hours in

---

[3]  Pursuant to 20 C.F.R. § 404.1567(b), "light work"

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying
> of objects weighing up to 10 pounds.  Even though the weight lifted may be very
> little, a job is in this category when it requires a good deal of walking or standing,
> or when it involves sitting most of the time with some pushing and pulling of arm
> or leg controls.  To be considered capable of performing a full or wide range of
> light work, [a claimant] must have the ability to do substantially all of these
> activities.  If someone can do light work, we determine that he or she can also do
> sedentary work, unless there are additional limiting factors such as loss of fine
> dexterity or inability to sit for long periods of time.

an 8 hour workday, and at one hour intervals, if in the standing position, should be able to shift positions permitting him to be off task for 5% of the work period in addition to regularly scheduled breaks. After sitting for 2 hours, he can also shift positions, but his need to do so would be accommodated by regularly scheduled breaks. The claimant can lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently. He is limited to up to occasional climbing of ramps and stairs, without climbing of ladders, ropes or scaffolds, and occasional balancing, stooping, kneeling, crouching and crawling. He is limited to up to frequent reaching, but with occasional overhead reaching, and should avoid extreme cold, extreme heat, humidity and vibration.

R. 370. In making the RFC determination, the ALJ reviewed the objective medical evidence and

other evidence including Conetta's testimony and symptoms under 20 C.F.R. § 404.1529 and

SSR 96-4p. The ALJ also considered medical opinion evidence under 20 C.F.R. § 404.1527 and

SSRs 96-2p, 96-5p, 96-6p and 06-3p. R. 370.[4] In determining Conetta's RFC, the ALJ accorded

varying weights to the opinions of the physicians and other specialists who examined Conetta

and/or his medical records. R. 376-87. Having determined Conetta's RFC, the ALJ evaluated at

step four whether Conetta could continue his past work as an electrician, and concluded that

based on Conetta's RFC, he could not. R. 388. At step five, the ALJ concluded — based on

Conetta's age, education, work experience, and RFC — that there were jobs that exist in

significant numbers in the national economy that Conetta could have performed pursuant to 20

---

[4] SSR 96-4p was rescinded on June 14, 2018. See Rescission of SSRs 96-3p and 96-4p, 83 Fed. Reg. 27816, 2018 WL 2967523. The regulation was rescinded because "the information contained in SSR 96-4p duplicates policy in SSR 16-3p," which became effective March 28, 2016. Id.

SSRs 96-2p, 96-5p, 96-6p and 06-3p were rescinded effective March 27, 2017. See Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p, Fed. Reg. 15263, 2017 WL 3928298. These three rules have been displaced by more recent final rules. See Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (January 18, 2017). However, because the new final rules apply "in claims filed on or after March 27, 2017," the old rules apply in this case. See Rescission of Soc. Sec. Rulings 96-2p, 96-5p, & 06-3p, 2017 WL 3928298, at *1-2.

C.F.R. §§ 404.1569 and 404.1569(a).  R. 389.

For these reasons, the ALJ concluded that Conetta "was not under a disability, as defined in the Social Security Act, at any time from September 20, 2010, the alleged onset date, through December 31, 2015, the date last insured."  R. 390.  Accordingly, Conetta was found "not disabled" under sections 216(I) and 223(d) of the Social Security Act.  R. 390.

## II.  GOVERNING STANDARDS OF LAW

### A.  Scope of Judicial Review Under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner "is limited to determining whether the [Commissioner's] conclusions were supported by substantial evidence in the record and were based on a correct legal standard."  Selian v. Astrue, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam) (citations and internal quotation marks omitted); accord Greek v. Colvin, 802 F.3d 370, 374-75 (2d Cir. 2015) (per curiam); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Substantial evidence is "'more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Greek, 802 F.3d at 375; Burgess v. Astrue, 537 F.3d 117, 127-28 (2d Cir. 2008); Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence."  Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (per curiam) (citation and internal quotation marks omitted).  Thus, "[i]f the reviewing court finds

substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990)). The Second Circuit has characterized the substantial evidence standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam). "The substantial evidence standard means once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." Id. (emphasis in original) (citations and internal quotation marks omitted). "The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision." Johnson, 563 F. Supp. 2d at 454 (citations and internal quotation marks omitted). Importantly, it is not a reviewing court's function "to determine de novo whether [a claimant] is disabled." Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998) (citation and internal quotation marks omitted); accord Cage v. Comm'r of Soc. Sec., 692 F.3d 118, 122 (2d Cir. 2012).

      B.  Standard Governing Evaluation of Disability Claims by the Agency

      The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see id. § 1382c(a)(3)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam); accord Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (per curiam); Craig v. Comm'r of Soc. Sec., 218 F. Supp. 3d 249, 260 (S.D.N.Y. 2016).

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Burgess, 537 F.3d at 120 (describing the five-step process). First, the Commissioner must determine whether the claimant is currently engaged in any "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(I), 416.920(a)(4)(I). Second, if the claimant is not engaged in substantial gainful activity, the Commissioner must decide if the claimant has a "severe medically determinable physical or mental impairment," 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii), which is an impairment or combination of impairments that "significantly limits [the claimant's] physical or mental ability to do basic work activities," 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, if the claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, or is equivalent to one of the listed impairments, the claimant must be found disabled regardless of his age, education, or work experience. See 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d). Fourth, if the claimant's impairment is not listed and is not equal to one of the listed impairments, the Commissioner must review the claimant's RFC to determine if the claimant is able to do work he or she has done in the past, i.e., "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). If the claimant is able to do such work, he or she is not disabled. 20 C.F.R.

§§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform past relevant work, the Commissioner must decide if the claimant's RFC, in addition to his or her age, education, and work experience, permits the claimant to do other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant cannot perform other work, he or she will be deemed disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). The claimant bears the burden of proof on all steps except the final one — that is, proving that there is other work the claimant can perform. See Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam).

C. The "Treating Physician" Rule

Under the so-called "treating physician" rule, in general, the ALJ must give "more weight to medical opinions" from a claimant's "treating source" — as defined in the regulations — when determining if the claimant is disabled. See 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); see also Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (the ALJ must give "a measure of deference to the medical opinion of a claimant's treating physician").[5] Treating sources "may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). An ALJ must accord "controlling weight" to a treating source's medical opinion as to the nature and severity of a claimant's impairments if the opinion "is well-supported by medically

---

[5] The SSA has subsequently "revised its rules to eliminate the treating physician rule; as a result, ALJs are now to weigh all medical evaluations, regardless of their sources, on the basis of how well supported they are and their consistency with the remainder of the record." Cortese v. Comm'r of Soc. Sec., 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017); see Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5867-68 (Jan. 18, 2017); accord Higgins v. Berryhill, 2018 WL 6191042, at *18 n.27 (S.D.N.Y. Nov. 28, 2018). But because the claim here was filed before March 27, 2017, see R. 81, the old rule applies in this case, see 20 C.F.R. §§ 404.1527, 416.927.

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Inversely, the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (citations omitted); accord Selian, 708 F.3d at 418 (citations omitted) ("The opinion of a treating physician on the nature or severity of a claimant's impairments is binding if it is supported by medical evidence and not contradicted by substantial evidence in the record.").

If the ALJ does not give controlling weight to a treating source's opinion, the ALJ must provide "good reasons" for the weight given to that opinion or face remand. See Greek, 802 F.3d at 375 (quoting Burgess, 537 F.3d at 129-30). When assessing how much weight to give the treating source's opinion, the ALJ should consider the factors set forth in the Commissioner's regulations, which are (I) the length of the treatment relationship and the frequency of the examination; (ii) the nature and extent of the treatment relationship; (iii) the supportability of the opinion with relevant evidence, particularly medical signs and laboratory findings; (iv) the consistency of the opinion with the record as a whole; (v) whether the opinion is from a specialist; and (vi) other relevant factors. See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); see also Ellington v. Astrue, 641 F. Supp. 2d 322, 330-31 (S.D.N.Y. 2009) ("the ALJ should weigh the treating physician's opinion along with other evidence according to the factors" listed in 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(2)-(6)). The Second Circuit has stated that it will "not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ[s] that do not comprehensively set forth reasons for

the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; see also Greek, 802 F.3d at 375-77. However, a "slavish recitation of each and every factor" is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear." Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order) (citing Halloran, 362 F.3d at 31-32).

III. DISCUSSION

Conetta raises three grounds for reversing the ALJ's decision: (1) that the ALJ failed to properly evaluate the effects of Conetta's impairments at step three of the sequential evaluation process, Pl. Mem. at 18-20; Pl. Reply at 2-4; (2) that the ALJ failed to properly evaluate the medical evidence from Conetta's treating physicians and to March 19, 2019make a proper RFC determination, Pl. Mem. at 20-28; Pl. Reply at 4-7; and (3) that the ALJ failed to properly assess Conetta's allegations with respect to his level of pain, Pl. Mem. at 28-31; Pl. Reply at 7-8. We discuss each of Conetta's arguments next.

A. The ALJ's Step Three Analysis

Conetta first argues that the ALJ erred at step three in determining that Conetta's impairments did not meet or equal listing 1.04(a), "Disorders of the spine." Pl. Reply at 2. Conetta argues that the determination was incorrect because there was objective medical evidence showing Conetta's "deficits in range of motion, diminished strength, muscle weakness and positive straight leg raising results." Pl. Mem. at 19. Conetta points to the fact that diagnostic testing confirmed the presence of nerve root impingement in the lumbar spine, and that an April 2011 MRI revealed diffuse disc bulging and "annular tear with moderate central canal stenosis and bilateral neuroforaminal narrowing, right worse than left, at the L3-L4 level; and annular tear with right neuroforaminal narrowing at the L4-L5 level." Id. at 18. Conetta argues that because "the ALJ does not make mention of these significant findings at all in his

Step-3 analysis," that analysis is flawed.  Id. at 20.

As stated above, at step three in the sequential analysis, the ALJ determines if the claimant suffers from a listed impairment.  20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). While Conetta asserts that the Commissioner did not "sustain her burden," on the issue of whether Conetta met the 1.04 listing, in fact, Conetta bears the burden of showing that he meets the Listing.  See Poupore, 566 F.3d at 306.  To meet this burden, Conetta must "meet all of the specified medical criteria [in the listing].  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."  Sullivan v. Zebley, 493 U.S. 521, 530 (1990) (footnote, citations, and emphasis omitted); see also 20 C.F.R. §§ 404.1525(c)(3), 404.1529(d)(2)-(3); accord Solis v. Berryhill, 692 F. App'x 46, 48 (2d Cir. 2017) (summary order); Gonzalez ex rel. Guzman v. Sec'y of U.S. Dep't of Health & Human Servs., 360 F. App'x 240, 243 (2d Cir. 2010) (summary order); Wood v. Colvin, 987 F. Supp. 2d 180, 192 (N.D.N.Y. 2013).  To show that he meets the criteria, a claimant "must offer medical findings equal in severity to all requirements, which findings must be supported by medically acceptable clinical and laboratory diagnostic techniques."  Knight v. Astrue, 32 F. Supp. 3d 210, 218 (N.D.N.Y. 2012) (citing 20 C.F.R. § 416.926(b)).

Here, the ALJ addressed the 1.04 listing by noting Conetta's obesity and stating that "[b]ecause the record does not establish that the claimant's impairments, alone or in combination, reach the level of severity contemplated in any relevant listings, disability cannot be established on this basis."  R. 369.  In other words, the ALJ referred to his discussion of Conetta's impairments in addressing the 1.04 listing.  Conetta argues that because the ALJ did not conduct the "thorough analysis required at Step 3 of the sequential evaluation process as stated above, which ultimately impacts the Plaintiff's assessed residual functional capacity," it

18

follows that "the ALJ's assessment of Plaintiff's residual functional capacity is flawed." Pl.

Mem. at 20.

> The Second Circuit, however, has stated that although it has
>
> cautioned that an ALJ "should set forth a sufficient rationale in support of his decision to find or not to find a listed impairment," the absence of an express rationale for an ALJ's conclusions does not prevent us from upholding them so long as we are "able to look to other portions of the ALJ's decision and to clearly credible evidence in finding that his determination was supported by substantial evidence."

Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry v.

Schweiker, 675 F.2d 464, 469 (2d Cir. 1982)); accord Solis, 692 F. App'x at 48; De La Paz on

behalf of S.S.D. v. Comm'r of Soc. Sec., 2018 WL 4179455, at *11 (S.D.N.Y. Aug. 31, 2018);

Hairston ex rel. S.N. v. Comm'r of Soc. Sec., 52 F. Supp. 3d 657, 672-73 (S.D.N.Y. 2014);

Batista ex rel. M.B. v. Astrue, 2010 WL 3924684, at *7 (E.D.N.Y. Sept. 29, 2010). However, a

reviewing court must remand if the ALJ's decision leaves the court "unable to fathom the ALJ's

rationale in relation to evidence in the record, especially where credibility determinations and

inference drawing is required of the ALJ." Berry, 675 F.2d at 469.

Thus, the ALJ's reference here to the "record" in assessing Conetta's impairments is

permissible as long as the ALJ supported his determination elsewhere in his decision. See De

Gonzalez v. Berryhill, 2018 WL 6834474, at *8 (E.D.N.Y. Dec. 28, 2018) ("Contrary to

plaintiff's assertion, the ALJ considered ample medical evidence outlined elsewhere in his

opinion that supports his finding that Listing 14.02 was not equaled."); Roche v. Berryhill, 2018

WL 560207, at *16 (S.D.N.Y. Jan. 25, 2018) (though the ALJ failed to "explain his rejection of

the claimed listed impairments . . . . [the ALJ] addressed [claimant's] motor, sensory and reflex

loss in the remainder of his decision, which supports his determination that [claimant] did not

satisfy the severity criteria set forth by" the listings); Scully v. Berryhill, 282 F. Supp. 3d 628,

635 (S.D.N.Y. 2017) (citations omitted) (non-specific reference by the ALJ in step three analysis to "the evidence detailed below" is "permissible, provided the ALJ supports this determination elsewhere in his or her opinion").

In this case, the ALJ's determination at step three that Conetta did not meet or equal listing 1.04(A) (disorders of the spine) was supported by substantial evidence in the record and is explained in the rest of the ALJ's decision. Listing 1.04(A) is entitled "Disorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the cauda equina) or the spinal cord." It requires that the claimant show each of the following:

> [1] Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, [2] limitation of motion of the spine, [3] motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, [4] if there is involvement of the lower back, positive straight-leg raising test (sitting and supine).

20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.04(A) (bracketing added). We agree with the Commissioner that it is not enough to show that one of these criteria existed on a single occasion or for a brief period. See Def. Mem. at 24. Rather, given that the definition of disability requires that the inability to work last for consecutive period of twelve months, see 42 U.S.C. § 423(d)(1)(A), the criteria must be met at least for this time period.

As to the medical evidence, the ALJ cited evidence supporting Conetta's claim of spinal deficits. R. 373-74. But, as the ALJ recounted, there was ample evidence to the contrary. Independent medical examiner and orthopedist Dr. Marc Berezin's notes from 2012, 2013, and 2014, revealed a "non-antalgic gait, with intact reflexes, negative straight leg raises, and no motor or sensory deficits." R. 374 (citing R. 951-52, 960-61, 970-71). The ALJ also cited

treating physician and orthopedic surgeon, R. 343, Dr. David Benatar as "repeatedly" noting that Conetta "exhibit[ed] near normal lumbar flexion" in 2012 and 2013. R. 374 (citing R. 326-27, 833-35). Furthermore, the ALJ found that "while an MRI of the claimant's lumbar spine taken in April 2011 revealed contact with the L4 foraminal nerve root from a disc protrusion at L2-3, and moderate canal stenosis and bilateral neuroforaminal narrowing at L3-4," a subsequent January 2014 "MRI of his lumbar spine . . . showed only 'borderline' canal stenosis at L3-4, only 'borderline' neural foraminal narrowing at L2-3, L3-4, and L4-5, and no evidence of any compression deformity, and with the conus, nerve roots and remaining neural foraminal and apophyseal facts all appearing to be normal." R. 374 (citing R. 821); see R. 821 (January 2014 MRI showed "no evidence of a compression deformity . . . [or] disc space narrowing"). There is other medical evidence suggesting that Conetta's deficiencies with respect to his range of motion were not as severe as Conetta and other physicians indicated. See, e.g., R. 850-51 (September 2015 follow-up physical indicating "[n]ormal" gait, "5/5" motor, and unrestricted range of motion), 815 (August 2014 notes indicating no swelling or deformity of the thoracic spine and pelvis, good strength, and "intact" sensory), 825-26 (June 2014 physical exam showing normal gait, and range of motion "without restriction"); 833-34 (February 2013 and April 2013 examinations noting no sensory loss or deficit); 960 (October 2011 physical therapy progress notes indicating "non-antalgic gait," "[n]o tenderness or spasm" in back, and "[n]o motor or sensory deficits, [r]eflexes intact and equal," and negative straight leg raise tests). Also, as the ALJ noted, Conetta's "treatment records do not document any observed use of a cane or other handheld assistive device to aid his ambulation or station." R. 375.

In light of this evidence, the ALJ could properly conclude that Conetta did not meet the criteria of listing 1.04(A). See, e.g., Beall v. Colvin, 2017 WL 1155809, at *4 (N.D.N.Y. Mar.

27, 2017) (substantial evidence supported finding that plaintiff did not meet Listing 1.04(A) where MRI results showed no evidence of nerve root compression). To meet a listed impairment, a claimant must demonstrate that he or she suffers from all of the listed criteria, no matter how severe any one particular element of the listing may be. Sullivan, 493 U.S. at 530-31; accord Solis, 692 F. App'x at 48-49. While Conetta argues that certain medical findings suggest that he did meet listing 1.04(A), see Pl. Mem. at 18-20; Pl. Reply at 2-4, Conetta's argument does not alter the fact that substantial evidence exists to support the ALJ's conclusion that Conetta's range of motion, straight leg raise testing, muscle atrophy, motor, and sensation were within normal limits. Nor does it alter the fact that the more recent January 2014 MRI showed "normal" nerve roots even if other results suggested otherwise. R. 821. The lack of nerve root compression alone is enough to support the finding that 1.04 was not met.

## B. The ALJ's Failure to Evaluate Treating Sources

Conetta's next argument is that the ALJ failed to properly evaluate the medical and opinion evidence necessary to make a proper RFC determination. Pl. Mem. at 20-28; Pl. Reply at 4-7. This is because, according to Conetta, the opinions of his treating physicians, orthopedic surgeons Dr. Peter L. Varriale and Dr. David Benatar, should have been accorded "greater weight or at minimum greater deference" because substantial evidence exists in the record to support their opinions. Pl. Mem. at 21, 23. Conetta further argues that it was erroneous to give greater weight to the opinions of consultative examiner Dr. John Axline and the "IMEs" — that is, the independent medical examiners who examined Conetta in connection with his workers' compensation case. Pl. Mem. at 23-26.

A claimant's RFC is "the most [a claimant] can still do despite [their] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC is a "function-by-function assessment based

upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. July 2, 1996). The SSA has stated that "[t]he RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . . Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy." Id. at *1; accord Ferraris v. Heckler, 728 F.2d 582, 585 (2d Cir. 1984) (citations omitted) ("[I]n making any determination as to a claimant's disability, the Secretary must explain what physical functions the claimant is capable of performing."). In determining a claimant's RFC, an ALJ weighs the opinions of physicians who have treated or examined the claimant. As previously discussed in Section II, a treating source's opinion, like that of Dr. Varriale or Dr. Benatar, is given controlling weight if the opinion is well supported by objective medical and clinical evidence in the record. If the opinion is inconsistent with other substantial evidence in the record, however, the opinion need not be given controlling weight. See Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (citing 20 C.F.R. § 404.1527(d)(2)); accord Schisler v. Sullivan, 3 F.3d 563, 567 (2d Cir. 1993). Additionally, an ALJ need not defer to a treating source's opinion on the ultimate issue of disability. See Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("the ultimate finding of whether a claimant is disabled and cannot work" is to be made by the ALJ, and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative"); accord Tracynger v. Comm'r, 269 F. Supp. 3d 106, 119 (S.D.N.Y. 2017) (citing cases).

Here, the ALJ did not err in according "little weight" to the opinions of Drs. Varriale and Benatar. See R. 378-83. Conetta has been treated by Dr. Varriale since 1997, who opined that Conetta has been unable to perform work at various points, mostly due to prior shoulder and

knee injuries. See R. 299. In 2007, based on injuries Conetta sustained in an automobile accident in 2006, Dr. Varriale opined that Conetta was "permanently disabled from performing the duties of" construction work, and that he would be limited to "light duty" jobs. R. 304. And Dr. Varriale opined in May 2011 that Conetta could only sit for 20 minutes at a time, stand for 10 minutes at a time, and sit/stand for less than two hours total in an eight hour work day. R. 193; see R. 231-33 (noting that Conetta could not lift or perform overhead work, and that Conetta would need periods of rest). Dr. Varriale consistently made note of Conetta's symptoms and physical deficiencies throughout 2010, 2011, and 2012. See, e.g., R. 238, 246, 260, 262, 266, 274, 280, 294, 330 (Dr. Varriale's notations showing either that Conetta could not return to work at all because of his shoulder injury, or that he could return with limitations on bending/twisting, climbing stairs/ladders, and lifting); see also R. 334 (noting that Conetta "is totally disabled from work").

The ALJ could properly give "little weight" to Dr. Varriale's opinions because they were inconsistent with the record as a whole. To start with, the ALJ could properly conclude that Dr. Varriale's 2007 opinion that Conetta was "permanently disabled from performing . . . construction work" due to shoulder and knee injuries sustained in a motor vehicle accident in 2006 was of "scant relevance" to the current claim for DIB, because Conetta had actually returned to work after that date. R. 378; see, e.g., R. 149 (showing Conetta's wage earnings from years 2008 to 2010); see also R. 292-94 (March 2010 opinion that Conetta had a 50% temporary impairment, and that he could return to work with certain physical imitations).

As to Dr. Varriale's March 2010 opinion that Conetta should avoid heavy lifting or overhead work, R. 292-94, the ALJ noted that Conetta underwent arthroscopic shoulder surgery in February 2011, but that in February 2012 he exhibited "significant gains" in his shoulder's

24

strength and range of motion. R. 377; see R. 1059 (workers compensation consultant, or "IME,"

Dr. Robert Moriarty's examination notes that the "rather routine" left shoulder surgery produced

a "good result," and that Conetta "demonstrate[d] excellent motion and excellent strength to his

shoulder with a negative impingement sign"); id. ("There is no evidence of rotator cuff weakness

on examination. There is no evidence of impingement syndrome. There is no evidence of

rotator cuff tearing."). In addition, there was other evidence in the record that contradicts Dr.

Varriale's opinions regarding limitations stemming from Conetta's shoulder impairments. For

example, an inspection of Conetta's left shoulder during an August 2011 examination revealed

"no swelling," "no atrophy," "no discoloration," and "no tenderness reported." R. 1050. The

same examination noted that although soreness was present after testing, Conetta's "[r]ange of

motion testing to the left shoulder reveal[ed] excellent motion with forward flexion 180/180

degrees, glenohumeral abduction 130/130 degrees, external rotation 70/70 degrees and internal

rotation 70/70 degrees." R. 1050. The examination further revealed "[r]otator cuff strength is

graded at 5/5 with the arm at the side," and negative drop-arm and thumbs-down testing.

R. 1050; see R. 1055 (similar "excellent" results at a December 2011 examination). As to

Conetta's back pain and lumbar spine conditions, Dr. Varriale's opinions as to the severity of

Conetta's alleged disabilities are contradicted by record evidence, including by Dr. Varriale's

own findings. To be sure, Dr. Varriale opined on multiple occasions that Conetta would be

unable to work due to his shoulder and back pain throughout 2010 to 2012, see, e.g., R. 250, 260,

268 (shoulder weakness or pain), 244, 258, 981 (low back pain), and that he also exhibited a

limited range of motion and slightly decreased strength due to these impairments, R. 210. But in

July 2011, for example, Dr. Varriale noted that Conetta demonstrated no significant

abnormalities in gait. R. 232. Additionally, as previously mentioned, a January 2014 "MRI of

[Conetta's] lumbar spine . . . showed only 'borderline' canal stenosis at L3-4, only 'borderline' neural foraminal narrowing at L2-3, L3-4, and L4-5, and no evidence of any compression deformity, and with the conus, nerve roots and remaining neural foraminal and apophyseal facts all appearing to be normal." R. 374 (citing R. 821).

As to Dr. Varriale's May 2011 opinion that Conetta could only sit for 20 minutes at a time, stand for 10 minutes at a time, and sit/stand for less than two hours total in an eight hour work day, R. 193, this opinion was also contradicted by evidence in the record. In July 2012, consultative examiner Dr. Axline opined that Conetta could sit for two hours at a time, stand for one hour at a time, walk for two hours at a time, and sit, stand, and walk for four to six hours total during an eight-hour work day. R. 350. The ALJ gave "significant weight" to Dr. Axline's assessment, which was based on a "thorough review of [Conetta]'s medical records that were submitted in connection with his claim for disability insurance by mid-2012." R. 376-77. In November 2015, treating source and chiropractor Charles Aronica provided a medical statement that Conetta could sit for 30 minutes at a time, stand for 12 minutes at a time, and walk for five minutes at a time, and could sit, stand, and walk for one to three hours total during an eight-hour work day. R. 884. The ALJ relied on other medical evidence contradicting Dr. Varriale's opinion. For example, the ALJ found that Conetta generally exhibited no motor or sensory defects. R. 379; see, e.g., R. 843 (noting "[t]here is no gross motor, strength, or sensory deficit" in March 2014), 841 (noting "[n]o motor or sensory deficits in either lower extremity" in November 2013), 837 (noting "[n]o motor or sensory deficits" in August 2013), 326 (noting "[n]o motor or sensory deficits" in May 2012). The ALJ also noted that Conetta was found to be able (despite some discomfort or difficulty) to heel and toe walk, R. 842 (February 2014), 835 (July 2013), 834 (February 2013), and to heel and toe rise, R. 833 (April 2013), 326 (May 2012),

with a non-antalgic gait, R. 970 (August 2014), 951 (October 2012).  In December 2011, Dr. Moriarty noted that Conetta expressed 75% improvement of his symptoms post-surgery, and that there would be "no need for any further specific medical care."  R. 1054-55.

Conetta also argues the ALJ improperly assigned "little weight" to the opinions of Dr. Benatar, who had been treating Conetta since 2012, and who "continuously" made "findings similar to those of Dr. Varriale, including: tenderness and spasm in the paraspinals, left worse than right; limited range of motion; positive straight leg raising at 50 degrees on the left and 60 degrees on the right; absent Achilles' reflex; and an antalgic gait, left worse than right."  Pl. Mem. at 22.  In addition to making those medical findings, Dr. Benatar also opined that Conetta's condition limits him to sitting, standing, and walking for a total of three hours during an eight-hour workday.  R. 338.  He also noted that Conetta would need to "get up and move around" every 30-45 minutes for 15-20 minutes at a time.  R. 338-39.  Dr. Benatar indicated that Conetta's symptoms would "likely increase" if he was "placed in a competitive work environment."  R. 340.  Dr. Benatar opined that Conetta was disabled on multiple occasions. See, e.g., R. 833 (April 2013); see also R. 893 (March 2015 opinion that Conetta "could only consider very sedentary" work, which still "would be difficult").

However, the ALJ could reasonably choose to assign "little weight" to Dr. Benatar's opinions, see R. 382-83, because of substantial contradictory evidence in the record.  For instance, with respect to Conetta's range of motion, in August 2011, Dr. Moriarty noted that an inspection revealed "excellent motion" in Conetta's left shoulder.  R. 1050.  And in December 2011, Dr. Moriarty noted that "testing again reveals excellent motion."  R. 1055.  As previously stated, the ALJ pointed to findings that Conetta exhibited no motor or sensory defects, R. 379; see, e.g., R. 843, 839, 326, and also noted that Conetta was generally found to be able to heel and

toe walk, R. 842 (February 2014), 835 (July 2013), 834 (February 2013) and heel and toe rise, R. 833 (April 2013), 326 (May 2012), with a non-antalgic gait, R. 970 (August 2014), 951 (October 2012). As to whether Conetta's conditions limit him to sitting, standing, and walking for a total of three hours during an eight-hour workday, or force him to "get up and move around" every 30-45 minutes for 15-20 minutes at a time, R. 338-39, the ALJ found persuasive Dr. Axline's opinion that Conetta could sit for two hours at a time, stand for one hour at a time, walk for two hours at a time, and sit, stand, and walk for four to six hours total during an eight-hour work day, R. 350, giving "significant weight" to the assessment, R. 376. The ALJ could properly accord "little weight" to Dr. Benatar's opinions, especially considering that in April 2014, pain management physician Dr. Neil Kirschen indicated that Conetta's symptoms were "[i]improved," that his pain level was "1-2" out of ten, and that Conetta's pain was more than 70% relieved. R. 823. In June 2014, Dr. Kirschen noted Conetta reported "increased activities," "increased walking," "[l]ess back pain," and "less frequent leg pain." R. 825; see R. 1094 (February 2016 physical noting that Conetta's chronic low back pain was "[b]etter with previous L4-5 epidural injections," and that he "states pain relief: better, 50% improvement"). Dr. Neal Dunkelman, another treating source, found that although Conetta was "partially disabled," his sensory and strength testing were often normal. See, e.g., R. 820 (noting, in January 2014, "intact" sensory, "good strength" and that gait was "stable without assist[ive] device"), 821 (noting "no evidence of a compression deformity" or "disc space narrowing"), 816 (finding only "partial disability" in September 2013). In 2011, treating source and chiropractor Dr. Aronica noted similarly that Conetta was only partially disabled, and also opined that he could not lift more than 50 pounds. R. 973. In 2015, Dr. Aronica opined that Conetta could occasionally lift up to 20 pounds, carry up to 20 pounds, and climb stairs and ramps. R. 883, 886.

In addition to the medical evidence, there was another important type of evidence here: namely, evidence regarding Conetta's activities, which contradicted the opinions of Drs. Varriale and Benatar that Conetta suffered from debilitating impairments. During the relevant period, Conetta continued to engage in activities consisting of: driving independently (R. 42), taking walks of up to a half mile every other day (R. 410), exercising (R. 58, 410, 834), going to a shooting range (R. 70-72, 406), hunting (R. 406-07), engaging in volunteer work with the U.S. Coast Guard (R. 45-47, 347, 407-08), driving to and attending the athletic events of his children (R. 404), and doing chores such as shopping, cooking, and cleaning (R. 69-70, 404). In multiple instances, Conetta testified to engaging in the same activities at two hearings that took place four years apart.

Additional evidence regarding Conetta's activities came in the form of surveillance conducted as part of Conetta's workers' compensation claim. During an August 2011 surveillance, Conetta was observed leaving his home and assisting another individual with electrical work. R. 801-02. During a September 2011 investigation, investigators observed Conetta driving to the marina wearing his Coast Guard uniform, entering a boat, holding a metal rod to assist in anchoring a boat, picking up a rope to tie off the boat, and stretching his arms above his head to place a plastic cover around the boat's cabin. R. 783-84. On that date, after Conetta returned from the marina, he went grocery shopping, holding bags in his left hand as he walked to his vehicle after shopping. R. 769, 785.

On October 8, 2011, the investigator observed Conetta go to a delicatessen to make a purchase and then drive to the Coast Guard station at Jones Beach. R. 769. In the afternoon, Conetta returned home and removed fishing rods from the rear of his vehicle. Once again, he traveled to a supermarket afterwards and emerged with a shopping bag in one hand and a cell

phone in the other.  R. 769, 786.

These unchallenged observations as well as the testimony regarding Conetta's walks and exercising undercut the opinions of the treating physicians, who during this same time period noted that Conetta's physical ailments and resulting pain substantially impaired him from lifting, reaching, and walking.  See, e.g., R. 232-33 (Dr. Varriale's July 2011 notes that Conetta's "constant, burning" pain prohibited him from "lifting" and engaging in any "overhead work"), 328-29 (Dr. Benatar's June 2012 notes stating that Conetta "remains disabled" in part due to his bilateral antalgic gait and limited range of motion), 985 (Dr. Aronica's June 2011 opinion that Conetta could return to work with the limitation of no heavy lifting); see also R. 179-80, 183-84 (July 2011 function report stating that "pain" affected Conetta's ability to bathe and groom himself, that lifting results in pain, and that Conetta can reach with his right arm only).

Conetta maintains that the ALJ erred in giving greater weight to consultative examiner Dr. Axline, Pl. Mem. at 23, and to independent medical examiners ("IMEs"), id. at 25-27.  As to Dr. Axline, Conetta maintains it was erroneous to give "significant weight" to the opinion that "Plaintiff could sit for 6 hours and stand and walk for up to 4 hours in an 8 hour workday, and could lift or carry up to 20 pounds occasionally and 10 pounds frequently."  Id. at 23 (citing R. 344-54).  This is because, according to Conetta, Dr. Axline's opinion is now "defunct" because "[t]he Federal District Court found [the ALJ's reliance on the opinion] to be a violation of sentence four of 42 U.S.C. 405(g) and thus remanded the claim back for administrative proceedings consistent with the Social Security Act . . . whereupon the Appeals Council remanded the claim for a de novo hearing."  Id. (record citations omitted).  This argument fails for two reasons.  First, the district court did not find any "violation" of Section 405(g); rather, the parties agreed and stipulated that Conetta's case would be remanded to the SSA for further

proceedings. Second, after remand, the new ALJ considered "all the evidence" in the record in making his determination. R. 367. There is no rule or legal principle requiring the ALJ to ignore evidence that was before the first ALJ in making his own disability determination.

Also with regard to Dr. Axline, Conetta argues that the ALJ erred because he "cited to various instances in the record that do not contain severe findings in order to subvert and overpower the numerous instances in the record that do contain severe findings." Pl. Mem. at 23-24. Conetta argues that the ALJ "glossed over" the fact that a 2014 MRI that the ALJ cited to showed that there was no evidence of nerve root compression also showed certain disk abnormalities that had not been present in a 2011 MRI. Id. at 24. But the ALJ is not required to discuss every piece of evidence. See, e.g., Fiorello v. Heckler, 725 F.2d 174, 176 (2d Cir. 1983) (the ALJ need not "reconcile explicitly every conflicting shred of medical testimony"). Even if the MRI showed certain disk abnormalities, the ALJ properly relied on substantial evidence in the record indicating that the impairments were not as severe as Conetta now maintains. In any event, the Commissioner's resolution of conflicting evidence is entitled to deference. See, e.g., Cage, 692 F.3d at 122; Veino, 312 F.3d at 588 (when record contains conflicting evaluations of claimant's condition, "it [is] within the province of the ALJ to resolve" that conflict). Because Dr. Axline's opinions to be consistent with the record, the ALJ did not err in affording his opinions significant weight. See Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record."); accord Suttles v. Colvin, 654 F. App'x 44, 46 (2d Cir. 2016) (summary order) (no error by ALJ to give great weight to consultative examiner's opinion because it was consistent with record evidence).

Last, as to the opinions of the opinions of the "IMEs" who were involved in a workers'

compensation investigation regarding Conetta, Conetta argues that these IME opinions "are not dispositive of disability under Social Security." Pl. Mem. at 26. According to Conetta, "numerous cases in the Federal District Courts have held that these [IME] reports cannot be considered substantial evidence for the purposes of determining entitlement to Social Security benefits." Id. (citing cases). But the ALJ in this case neither deferred to nor relied solely on the opinions of the IMEs. See R. 385-87. In fact, in making his RFC determination and overall disability determination, the ALJ relied on medical records as well as evidence from surveillance videos to support his conclusions. Use of the IMEs' opinions was only a part of the ALJ's comprehensive analysis of the record.

It is well settled that the opinions of a treating source "need not be given controlling weight where they are contradicted by other substantial evidence in the record." Veino, 312 F.3d at 588. In this case, the opinions of Drs. Varriale and Benatar that Conetta was either disabled or unable to work were inconsistent with substantial evidence in the record as detailed above. Also, the ALJ provided good reasons for making his determination. Accordingly, the ALJ did not err in according their opinions "little weight" in making his RFC determination. See Crowell v. Comm'r of Soc. Sec., 705 F. App'x. 34, 35 (2d Cir. 2017) (citing Halloran, 362 F.3d at 32-33) ("An application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in § 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation."); Atwater, 512 F. App'x. at 70; see also Snell, 177 F.3d at 133 ("the ultimate finding of whether a claimant is disabled and cannot work" is to be made by the ALJ and "[a] treating physician's statement that the claimant is disabled cannot itself be determinative").

C. Credibility of Claimant's Allegations

"After careful consideration of the evidence," the ALJ found that Conetta's "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 371. However, the ALJ also determined that Conetta's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 371. Conetta contends that the ALJ's "boilerplate statement as to [his] credibility" was insufficient under the SSA regulations. Pl. Mem. at 29-30. He argues that although his daily activities should be factored into the credibility determination, they are "but one of many factors that must be considered." Id. at 30. In other words, according to Conetta, the ALJ, in making his decision to discredit Conetta's statements, erred in relying too heavily on Conetta's ability to engage in certain activities including work with the Coast Guard, performing household chores, and exercising. Id. at 30-31.

"It is the function of the [Commissioner], not [the reviewing court], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) (citing Perales, 402 U.S. at 399) (additional citations omitted). Thus, the ALJ, "after weighing objective medical evidence, the claimant's demeanor, and other indicia of credibility . . . may decide to discredit the claimant's subjective estimation of the degree of impairment." Tejada v. Apfel, 167 F.3d 770, 775-76 (2d Cir. 1999) (summarizing the holding of and citing with approval Pascariello v. Heckler, 621 F. Supp. 1032, 1036 (S.D.N.Y. 1985)). "If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." Aponte v. Sec'y, Dep't of Health & Human

Servs., 728 F.2d 588, 591 (2d Cir. 1984) (internal citations omitted); accord Them v. Colvin, 2015 WL 10635499, at *13 (S.D.N.Y. Dec. 22, 2015) (upholding ALJ's credibility determination as supported by the record); Vargas v. Astrue, 2011 WL 2946371, at *15 (S.D.N.Y. July 20, 2011) (same); see also 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). However, to the extent that an ALJ's credibility finding is not supported by substantial evidence in the record, it should not be upheld. See, e.g., Cardillo v. Colvin, 2017 WL 1274181, at *12 (N.D.N.Y. Mar. 24, 2017) ("[A]n ALJ's decision 'must contain specific reasons for the finding on credibility, supported by the evidence in the case record . . . .'") (quoting Osorio v. Barnhart, 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006) (citation omitted)). Here, because substantial evidence supports the ALJ's credibility determination, it must be upheld.

To start, the ALJ concluded that as to Conetta's "shoulder impairments, the medical evidence of record provides only limited support for the claimant's allegations, and tends to indicate that his symptoms are not as severe, persistent or limiting as he has alleged." R. 371. This conclusion is supported by the notes and medical findings of treating physician Dr. Varriale, and IMEs Drs. Michael Katz, and Moriarty. For instance, though he continued to treat Conetta into 2011, shortly after Conetta injured his shoulder in March 2010, Dr. Varriale noted that an x-ray of Conetta's shoulder was "within normal limits," and that his impressions as to Conetta's symptoms was shoulder strain. R. 292. In November 2010, Dr. Katz evaluated the shoulder, and observed close to normal abduction, flexion, and external rotation, "moderate impingement," "no deformity about the clavicle or AC joint," and intact sensation. R. 1046. And even post-shoulder surgery, R. 371, Dr. Varriale's notes from July 2011 indicate that

34

Conetta's left shoulder range of motion was greatly improved from March 2011. Compare R. 222 with R. 235-36; see also R. 333 (Dr. Varriale's December 2011 notes indicating that the range of motion in Conetta's left shoulder had improved since the July 2011 examination). That same month, Conetta indicated to Dr. Moriarty that "he feels 75% improved," R. 1054, and testing revealed "excellent" range of motion, R. 1055. Notes from a follow up examination in April 2014 by treating physician Dr. Benatar show that Conetta did not report any shoulder pain. R. 823; see R. 844 (April 2014 report from Dr. Benatar's office noting that Conetta "rarely uses pain medication"). Finally, Conetta himself stated he could still be doing his "light-duty" job as a sub-foreman if he had the shoulder pain he is experiencing. R. 58. Based on this evidence, the ALJ clearly could make the determination that Conetta's left shoulder injury was not as restrictive as he stated.

As to his knee pain, the ALJ specifically noted that Conetta had undergone three "knee surgeries, in 1997, 2000, and in 2006, to fix cruciate ligament and meniscus tears in his right knee, including tears that occurred following a motor vehicle collision that occurred in March 2006." R. 373. However, it is not disputed that Conetta returned to work after these surgeries. See, e.g., Pl. Mem. at 5-6. Furthermore, the ALJ, "[i]n accordance with SSR 02-1p, . . . considered the extent to which the claimant's obesity may exacerbate his other impairments. In particular, [the ALJ] [found] that the claimant's obesity may exacerbate the claimant's knee and back impairments, resulting in greater symptoms and limitations than those impairments might cause on their own." R. 373. Indeed, at his April 2016 hearing, Conetta stated that he thinks his "weight does have to reflect" on his knee "symptoms" "a little bit," R. 413-14. At his 2012 hearing, Conetta testified that if it were not for his September 2010 back injury, he could still be doing his "light-duty" job as sub-foreman even with his knee pain. R.

56, 58.  Accordingly, the ALJ could reasonably make the determination that Conetta's left shoulder pain and knee pain was not as severe as he stated.

As to his symptoms of back pain, the ALJ discussed at length why the "evidence tends to show that these symptoms are not as severe, persistent or limiting as the claimant has alleged." R. 374; see R. 374-76.  The ALJ's conclusion is supported by the notes of treating physicians Drs. Varriale and Benatar, and IME Dr. Berezin, evidence that has been already detailed in Sections III.A and III.B above.  For example, Dr. Berezin's notes from 2012, 2013, and 2014, reveal non-antalgic gait, intact reflexes, negative straight leg raises, and no motor or sensory deficits.  See R. 951-52, 960-61, 970-71.  Moreover, as early as July 2011, Dr. Varriale noted that Conetta exhibited no significant abnormality in gait.  R. 232.  And in April 2014, Dr. Kirschen indicated that Conetta's symptoms were "[i]improved," that his pain level was "1-2" out of ten, and that Conetta's pain was at least 70% relieved.  R. 823.  In June 2014, Dr. Kirschen noted Conetta reported "increased activities," "increased walking," "[l]ess back pain," and "less frequent leg pain."  R. 825.  In light of these notations and others in the record, the ALJ could reasonably determine that Conetta's symptoms as to his back and back pain were "not as severe, persistent or limiting as [Conetta] . . . alleged."  R. 374.

Conetta again invokes the district court's 2014 remand of the case in arguing that the ALJ's reliance on Conetta's ability to engage in certain activities is erroneous because "[t]he Federal District Court found this to be a violation of sentence four of 42 U.S.C. 405(g) and thus remanded the claim back for administrative proceedings consistent with the law, . . . whereupon the Appeals Council remanded the claim for a de novo hearing."  Pl. Mem. at 30 (record citations omitted).  But as previously stated, see Section III.B above, the district made no such finding when it remanded in 2014.  See R. 457-59.

36

Conetta cites <u>Marcus v. Califano</u>, 615 F.2d 23 (2d Cir. 1979), for the proposition that "severe, disabling pain may give rise to a grant of disability benefits even if 'objective' clinical findings do not provide proof of an affliction ordinarily causing such pain."  Pl. Mem. at 29.  But in that case, the court remanded due not to the ALJ basing her "decision . . . on the lack of appellant's credibility," but "on the erroneous belief that objective findings of an affliction more serious than osteoporosis were necessary to a finding that appellant was disabled."  <u>Marcus</u>, 615 F.2d at 28 n.5.  Here, the ALJ did base his decision in part on the lack of Conetta's credibility due to contradictory evidence in the record.  Thus, the reasoning in <u>Marcus</u> does not apply here.

Conetta argues that the ALJ relied too heavily on Conetta's ability to engage in certain activities in making his credibility determination.  <u>See</u> Pl. Mem. at 28-31; Pl. Reply at 7-8.  But case law holds that an ALJ "'is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.'"  <u>Barry v. Colvin</u>, 606 F. App'x 621, 622 (2d Cir. 2015) (quoting <u>Genier</u>, 606 F.3d at 49) (summary order); <u>accord</u> <u>Marcus</u>, 615 F.2d at 27. Instead, the ALJ "has the discretion to . . . arrive at an independent judgment . . . in light of medical findings and other evidence, regarding the true extent of the pain alleged by the claimant."  <u>Mimms v. Heckler</u>, 750 F.2d 180, 186 (2d Cir. 1984) (citations and internal quotation marks omitted); <u>accord</u> <u>Them</u>, 2015 WL 10635499, at *12-14 (applying standard and finding substantial evidence to support ALJ's credibility determination).  Here, the ALJ considered the record as a whole and determined that, although Conetta suffered from ongoing pain, that pain resulted only in the limitations found by the ALJ.

V.  <u>CONCLUSION</u>

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings

(Docket # 21) is granted and Conetta's motion for judgment on the pleadings (Docket # 14) is denied. The Clerk is requested to enter judgment.

      SO ORDERED.

Dated: New York, New York
      March 19, 2019

GABRIEL W. GORENSTEIN
United States Magistrate Judge